# EXHIBIT 1

**BICKERTON LAW GROUP**
A LIMITED LIABILITY LAW PARTNERSHIP

JAMES J. BICKERTON                    3085
BRIDGET G. MORGAN-BICKERTON          8705
TYLER D. MINCAVAGE                   11473
Topa Financial Center, Fort Street Tower
745 Fort Street, Suite 801
Honolulu, Hawai'i  96813
Telephone: (808) 599-3811
Facsimile: (808) 694-3090
Email:  bickerton@bsds.com; morgan@bsds.com; mincavage@bsds.com

ANNE ANDREWS (California Bar No. 103280) (pro hac application forthcoming)
aandrews@andrewsthornton.com
SEAN T. HIGGINS (California Bar No. 266888) (pro hac application forthcoming)
shiggins@andrewsthornton.com
ROBERT S. SIKO (California Bar No. 312856) (pro hac application forthcoming)
rsiko@andrewsthornton.com
**ANDREWS & THORNTON**
4701 Von Karman Ave, Suite 300
Newport Beach, California 92660
Telephone:     (949) 748-1000
Facsimile:     (949) 315-3540

***Attorneys for Plaintiffs***

Electronically Filed
SECOND CIRCUIT
2CCV-23-0000272
18-SEP-2023
04:19 PM
Dkt. 1 CMPS

## IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| JON GLOEGE, individually, ANDREA WHEELER, individually and on behalf of the heirs of DOUG GLOEGE, <br><br> *Plaintiffs*, <br> v. <br><br> MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAIIAN ELECTRIC INDUSTRIES, INC.; ELLIOT KAWAIHO'OLANA MILLS, CRYSTAL KAUILANI ROSE, JENNIFER NOELANI GOODYEAR-KA'ŌPUA, MICHELLE KA'UHANE, AND ROBERT K.W.H. NOBRIGA, TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP; COUNTY OF MAUI; STATE OF HAWAI'I; DOES 1-100; <br><br> *Defendants*. | CIVIL NO: <br> (Other Non-Vehicle Tort) <br><br> **COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS** |

## COMPLAINT

1.     Plaintiff JON GLOEGE, individually, and Plaintiff ANDREA WHEELER, individually and on behalf of the heirs of DOUG GLOEGE (collectively "PLAINTIFFS"),[1] by and through their Attorneys of record, brings this action against Defendants MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAIIAN ELECTRIC INDUSTRIES, INC.; ELLIOT KAWAIHOʻOLANA MILLS, CRYSTAL KAUILANI ROSE, JENNIFER NOELANI GOODYEAR-KAʻŌPUA, MICHELLE KAʻUHANE, AND ROBERT K.W.H. NOBRIGA, TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP; COUNTY OF MAUI; STATE OF HAWAIʻI,  and DOES 1-100 (collectively, "DEFENDANTS") for the wrongful death of Doug Gloege. PLAINTIFFS allege on information and belief, except for information based on personal knowledge, as follows:

## JURISDICTION AND VENUE

2.     This Court has general personal jurisdiction over all Defendants in that, as alleged herein, Plaintiffs' causes of action against Defendants arise from transactions and occurrences which occurred in this State and otherwise from Defendants' tortious conduct within this State and/or Defendants, and each of them, are otherwise domiciled in this State.

3.     Venue is proper in this Court because the acts complained of in this Complaint occurred in this circuit. The amount in controversy exceeds the jurisdictional minimums of this Court.

## INTRODUCTION

4.     PLAINTIFFS bring this lawsuit for the wrongful death of Doug Gloege, who was

---

[1] Plaintiff Jon Gloege is the natural son of Doug Gloege. Plaintiff Andrea Wheeler is the natural daughter of Doug Gloege. She will be applying to serve as the representative of his Estate, but at present her representative capacity has not been approved by a probate court and thus she brings this action on behalf of all potential heirs for the wrongful death of Doug Gloege.

tragically and suddenly killed trying to escape the fires that devastated the community of Lahaina on August 8, 2023. These fires were caused by each of the Defendants as alleged herein. For years, as Maui continued to get drier and hotter, the spread of invasive, non-native, flammable grasses and brush vegetation took over the island (hereinafter "grasslands"), the electrical system continued to decay, and the potential for increased fires originating in and/or fueled by these grasslands was actively discussed among governmental officials, utilities and informed academics and well-known to owners of such grasslands. The combination of weather[2], uncontrolled vegetation and aging electrical infrastructure created a tinderbox ready to explode in Maui. The risk was not theoretical. Grass-originated and grass-fed fires continue to grow in Hawaiʻi.

5.      In August 2018, major fires originating on and fueled by the grasslands caused significant damage and personal injury in the Lahaina area ("the 2018 Fires"). As Hurricane Lane moved south of the Islands of Hawaiʻi on August 23, 2018, along a very typical and predictable track frequently taken by hurricanes at this time of year, increased winds associated with it and a ridge to the north (a common occurrence when tropical storms pass south of the islands in the late summer) produced strong, dry winds in western Maui. The strong winds downed trees and power lines. Fires sparked in grasslands grew rapidly, fanned by wind gusts estimated at 60–80 mph. The largest of the fires occurred in Kauaula Valley, just southeast of Lahaina, burning 2,800 acres and injuring two people, one due to burns and another due to smoke inhalation. Six hundred people were evacuated due to the 2018 Fires overall. The fire destroyed 22 homes, leaving 60 people

---

[2] On October 12, 2020, Defendant Maui Country sued several "major corporate members of the fossil fuel industry" (2CCV-20-0000283, Dkt. 1 at 1, ¶1), alleging, *inter alia*, that "[a]s a direct and proximate consequence of Defendants' wrongful conduct… the environment in and around the County [of Maui] is changing, with devastating adverse impacts on the County and its residents. For instance, average sea level has already risen and will continue to rise substantially along the County's coastlines, causing… beach loss; ***extreme weather,*** including hurricanes and tropical storms… drought, heatwaves, ***wildfires*** and other phenomena will become more frequent, longer-lasting, and more severe…." *Id.* at 4, ¶10.

homeless; it also burned 30 vehicles. Flames reached the field track at Lahainaluna High School. A second fire ignited near the Lahaina Civic Center, burning 800 acres and one home in Kaanapali. Twenty-six evacuees staying at Lahaina Intermediate School were forced to relocate due to the fire.

6.     Despite this history of serious fires caused by predictable weather conditions, no one in a position to effect change did anything to prevent or substantially mitigate the risk. Utilities did not harden the grid or develop de-energization policies to reduce the risk of electrical fires. Large landowners did not properly maintain, remove or replace flammable non-native grass and brush to reduce the fuel load for fire spread. County officials did not make preparations to adequately handle such an emergency. When another hurricane approached the islands in August 2023, just five years later, none of these entities can claim that it was unforeseeable that electrical-caused fires would be driven by the wind across large unmanaged grasslands into Lahaina. The result of these years of neglecting and disregarding the risk that the 2018 Fires would be repeated when similar conditions inevitably occurred was the greatest single-day loss of life and property in Hawaiʻi history on August 8, 2023, a catastrophe and tragedy for which all Defendants named herein should share in the fault.

## **PARTIES**

7.     Plaintiff Jon Gloege is a resident of the state of Arizona. Plaintiff Jon Gloege is the natural son of the decedent Doug Gloege and represents the interests of the heirs at law for the wrongful death of Doug Gloege.

8.     Plaintiff Andrea Wheeler is a resident of the state of Arkansas.  She is the natural daughter of the decedent Doug Gloege and represents the interests of the heirs at law for the wrongful death of Doug Gloege.

4

9.      Doug Gloege was, at the time of his death, a long-time resident of the state of Hawai'i for more than 20 years living at 390 Paeohi St., Lahaina, HI 96761 at the time of his death.

10.     Defendant Maui Electric Company, Limited ("MECO") is a corporation doing business in the State of Hawai'i with its principal place of business in the City and County of Honolulu, State of Hawai'i. MECO is an electric utility company that owns and operates the electrical grid in Maui and has provided electric energy to Maui for 100 years. MECO was purchased by Defendant Hawaiian Electric Company, Inc. in the 1960s. On information and belief, MECO is a wholly owned subsidiary of Defendant Hawaiian Electric Company, Inc.

11.     Defendant Hawaiian Electric Company, Inc. ("HECO") is a corporation doing business in the State of Hawai'i, in the County of Maui, with its principal place of business in the City and County of Honolulu, State of Hawai'i. HECO is an electric utility company that generates and sells electric energy and has done so since the late 1800s.

12.     Defendant Hawaiian Electric Industries, Inc. ("HEI") is a corporation and the parent and holding company of HECO and, in turn, MECO. On information and belief, HECO is a wholly owned subsidiary of HEI. HEI is doing business in the State of Hawai'i, in the County of Maui, with its principal place of business in the City and County of Honolulu, State of Hawai'i. HEI, through its subsidiaries, supplies nearly all of the electricity to the state of Hawai'i.

13.     This Complaint refers to HECO, MECO and HEI collectively as "HECO Defendants."

14.     Defendants Elliot Kawaiho'olana Mills, Crystal Kauilani Rose, Jennifer Noelani Goodyear-Ka'ōpua, Michelle Ka'uhane, and Robert K.W.H. Nobriga (collectively the "Trustees") serve as the trustees of the Estate of Bernice Pauahi Bishop, a charitable foundation owning large areas of land within the state of Hawai'i (the Trustees and their trust are hereinafter referred to collectively as "BISHOP"), with its principal place of business in the City and County of Honolulu,

State of Hawaiʻi. Under Hawaiʻi law, the Trustees are named as defendants for the torts committed by the trust, and thus the Trustees are named as Defendants herein rather than the entity of the trust, which does not have a separate legal existence under Hawaiʻi law.[3]

15.    BISHOP was established more than 100 years ago. It is a land trust that was endowed with nearly 10% of the landmass of the state of Hawaiʻi. Today, BISHOP owns several large parcels of land that were in the path of and facilitated the fire destruction that ultimately destroyed the residence of 390 Paeohi St., Lahaina, HI 96761 and also cut off escape paths or routes, sending Doug Gloege in flight and ultimately resulting in his death, including but not limited to 1,137 acres of land in Lahainaluna to the east and south of 390 Paeohi St., Lahaina, HI 96761.

16.    Defendant County of Maui ("MAUI COUNTY") is located in the state of Hawaiʻi. MAUI COUNTY owns several parcels of land that were in the path of and facilitated the firestorm that ultimately destroyed the residence of 390 Paeohi St., Lahaina, HI 96761 sending Doug Gloege in flight and ultimately resulting in his death. The MAUI COUNTY holdings which fed the fire include but are not limited to two lots in the Lahainaluna area. These lots not only contributed to the destruction of 390 Paeohi St., Lahaina, HI 96761, but also endangered, obstructed, and/or caused the cut-off of escape routes for victims fleeing the fire like Doug Gloege.

17.    Defendant State of Hawaiʻi ("STATE") owns several parcels of land that were in the path of and facilitated the firestorm that ultimately destroyed the residence of 390 Paeohi St., Lahaina, HI 96761 sending Doug Gloege in flight and ultimately resulting in his death. The STATE holdings which fed the fire include but are not limited to parcels east and northeast of 390

---

[3]In *Henry Waterhouse Trust Co. v. King*, the Hawaiʻi Supreme Court reiterated the "familiar" common-law rule that "the liabilities incurred by trustees—whether such liabilities are in contract or in tort or under the terms of a statute—are *their* liabilities. They are principals." *See* 33 Haw. 1, 18 (Haw. 1934) (emphasis in original).

Paeohi St., Lahaina, HI 96761. These lots not only contributed to the destruction of 390 Paeohi St., Lahaina, HI 96761, but also endangered, obstructed, and/or caused the cut-off of escape routes for victims fleeing the fire like Doug Gloege.

18.     PLAINTIFFS have reviewed public and other records available in order to ascertain the true and full names and identities of all defendants in this action, but PLAINTIFFS have no further knowledge or information at this time regarding all responsible parties and is unable to ascertain the identity of defendants in this action designated as Does 1-100 (collectively, the "Doe Defendants"). The Doe Defendants are sued herein under fictitious names for the reason that their true names and identities are unknown to PLAINTIFFS, except that they may be connected in some manner with the named Defendants, such as being agents, servants, employees, employers, representatives, co-venturers, associates, or independent contractors of Defendants and/or were in some manner presently unknown to the PLAINTIFFS engaged in activities such as designing, manufacturing, selling, distributing, installing and/or providing materials and/or services to Defendants. The Doe Defendants' true names, identities, capacities, activities, and/or responsibilities are presently unknown to PLAINTIFFS or their attorneys. PLAINTIFFS pray for leave to amend this Complaint to show the true names and capacities, activities, and/or responsibilities when the same has been discovered.

## **GENERAL ALLEGATIONS**

### ***The Risk of Wildfires to Lahaina Was Known to Defendants***

19.     The threat of hurricanes and their attendant high winds invariably loom over Hawaiʻi. A handful of hurricanes endanger the state each year. Climate change makes hurricanes more ferocious, increasing the peril for Hawaiʻi statewide.

20.    Since 2000, at least 22 hurricanes or their remnants have either impacted or nearly impacted Hawaiʻi, thirteen of which occurred since 2010. In recent years, dozens of hurricanes or tropical storms made landfall or passed within miles of Hawaiʻi's shores.

21.    Hawaiʻi has also been plagued by non-native and flammable grasses. A 2018 report from the Hawaii Wildfire Management Organization noted that over the past decade more than 1,000 wildfires burning more than 17,000 acres occur every year in Hawaiʻi. The report concluded that much of the increased rate of wildfire in Hawaiʻi, more than a 400% increase over the past century, is due to human conduct and specifically to "nonnative, fire-prone grasses and shrubs [that] now cover nearly one quarter of Hawaii's total land area and, together with a warming, drying climate and year-round fire season, greatly increase the incidence of larger fires."

22.    Another 2018-2019 report from Hawaii Wildfire Management Organization funded by the State and the U.S. Forest Service was particularly attuned to the fact research shows vegetation is a "key ingredient in the recipe for recurring wildfire." They pointed out the seemingly obvious conclusion that "reducing wildfire hazard is a landscape-level issue" because fires do not respect property boundaries.

23.    During this study, large landowners (more than 1% of island area) were contacted to help with mapping the vegetation wildfire risk. For Maui, the project mapped 132,000 acres and identified 90 miles of needed firebreaks and outlined fuel reduction mitigation. Unsurprisingly, Lahaina had the most dangerous combination of ignition density, hazardous vegetation and high wildfire risk:





24.     The report recommended the solution was cross-boundary vegetation management.

It specifically recommended enhanced vegetation management by landowners around Lahaina:



25.    The report recommended multiple ways to clear dangerous vegetation, including herd grazing, heavy machinery, herbicide, manual labor, mowing and mulching. Yet, only 22% of landowners engaged in any kind of regular vegetation maintenance. Thirty-percent of landowners engaged in no maintenance of dangerous vegetation on their land.

26.    Nearly a decade ago, the Hawaii Wildfire Management Organization issued a 2014 wildfire mitigation plan that warned Lahaina was among Maui's most fire-prone areas based on its proximity to grasslands, steep terrain, and frequent winds and outlined a plan for working with utilities to help reduce the risk of fires.

27.    A 2020 Maui County Hazard Mitigation Plan Update depicts Lahaina and all Lahaina buildings as occupying a "High" Wildfire Risk Area.

Maui County Hazard Mitigation Plan Update



*Figure 256. Buildings in Wildfire Risk Areas in Southern West Maui Community Planning Area.*

28.    The 2020 Maui County Hazard Mitigation Plan Update also warned that West Maui has a "Highly Likely (greater than 90% annual chance)" likelihood of experiencing wildfires.

29.    Consistent with Hawai'i authorities and agencies, Federal Emergency Management Agency's April 2023 Wind Retrofit Guide for Residential Buildings in Hurricane-Prone Regions designates the entire state of Hawai'i as a hurricane-prone region at risk of high-wind hazards.

30.    As predicted, and as noted above, in 2018, Hurricane Lane aggressively spread wildfires in the hills above Lahaina. County officials considered themselves lucky that the fire did not jump Lahainaluna Roard or it would have devastated the town of Lahaina. Nevertheless, 2,800 acres burned and more than 20 structures were destroyed.

31.    In 2019, a series of brush fires across Maui burned more than 25,000 acres. Most of the fires took place in Central Maui, home to thousands of acres of former sugar lands and full of dry vegetation considered fuel for wildfires. It was understood that most of Hawai'i's wildfires

are enabled by unmanaged nonnative grasslands that have dramatically expanded - by more than 60% - since the decline of Hawaiʻi's agricultural footprint in the 1960s.

### *HECO Defendants Request Funding to Harden Grid Too Late*

32.    Jennifer Potter, a recent member of the Hawaii Public Utilities Commission, and who lived in Lahaina on Maui, confirmed that all the Defendants knew about the wildfire risk to Maui: "There was absolutely knowledge within the state and within the electric industry that fire was a huge, huge concern on the island of Maui, and even more so than any of the other islands[.]"

33.    HECO Defendants had specific knowledge of the risk of wildfire on Maui. HEI submitted a 2022 request for funding from the public utilities commission to offset the $189.7 million HEI would need to spend to bolster its power grid statewide, which included wildfire-prevention measures.

34.    HECO Defendants indicated in their funding request that "[t]he risk of a utility system causing a wildfire ignition is significant" and that HECO Defendants sought funding, in part, to guard against their facilities being "the origin or a contributing source of ignition for a wildfire."

35.    However, HECO Defendants understood that the electric system in Maui needed to be hardened, specifically including replacing aging towers or undergrounding lines, long before the 2022 funding request. The 2014 report made the danger public and obvious, but as electric operators, HECO Defendants should have known decades before that the infrastructure was nearing the end of its useful life.

36.    They could have seen the deadly consequences of decrepit infrastructure by looking to California where the failure of a C-hook on a 100-year-old electrical line caused the devastating Camp Fire in 2018 which killed 85 people and prompted the very public Chapter 11 bankruptcy of PG&E. The spectacular fall of the largest utility in the U.S. was well known in the industry.

37.    As discussed above, the 2018-2019 report from Hawai'i Wildfire Management Organization focused on fire risk in Maui following a series of wildfires across Maui in 2018. In addition to discussing the threat of wildfire spread from unmaintained vegetation, the report pointed out the unique risk posed by electrical lines: "Aboveground power lines are vulnerable to wildfire and can even provide the ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions. There are long-term solutions for reducing power line-related wildfire hazards such as infrastructure upgrades." It recommended updating the infrastructure and burying power lines, particularly in high-risk areas, and specifically in Lahaina.

38.    HECO Defendants should have planned for such improvements long before 2022. In fact, it was well known that the grid owned and operated by HECO Defendants uses old wooden poles that are largely uninsulated and strung with vegetation over miles of rugged terrain. Energy experts have long called for the utility to harden its grid, and despite the cost, to put more of it underground. Had they done so, the capital improvements would have enabled the grid to withstand the hurricane level winds that whipped across Maui on August 8, 2023 and in so doing, prevented a deadly fire.

### *Specific Warnings Before Lahaina Fire and Failure to Deenergize/Prepare*

39.    On Friday, August 4, 2023, the National Weather Service in Honolulu ("NWS") posted on X, formerly known as Twitter, that Hawai'i could experience "indirect impacts" from Hurricane Dora from Monday, August 7, 2023 through Wednesday, August 9, 2023, including "Strong and gusty trade winds" and "Dry weather & high fire danger."

40.    Two days later, on Sunday, August 6, 2023, NWS posted a warning on X: "Strongest winds in yellows & oranges on map result from significant pressure differences between high & low pressures. Combined w/ dry conditions, these winds pose a serious fire & damaging wind threat. Stay alert!" NWS also posted an update on Hurricane Dora on X, which

included the following warning: "While Hurricane Dora passes well south with no direct impacts

here, the strong pressure gradient between it & the high pressure to the north creates a threat of

damaging winds & fire weather (due to ongoing dry conditions) from early Mon to Wed."  Every

Defendant named herein knew or should have known that conditions nearly identical to those of

the 2018 fire were soon going to occur.





41.    On Monday, August 7, 2023, NWS issued an updated warning for the Hawaiian Islands, as reported in The Maui News. This warning contained both a High Wind Watch and a Fire Warning for the leeward portions of the state, which included Lahaina. The warning cautioned that damaging winds could blow down power lines and that any fires that developed would likely spread rapidly.

42.    On Tuesday, August 8, 2023, the NWS issued both a High Wind Warning and Red Flag Warning for portions of the Hawaiian Islands, including West Maui. Specifically, the NWS warned the following: "High Wind: 30–45 mph winds, gusts up to 60 mph . . . . Red Flag: High fire danger with rapid spread. NO outdoor burning. Stay safe & cautious!"



43.    Per NWS, a Red Flag Warning "means that critical fire weather conditions are either occurring now or will shortly. A combination of strong winds, low relative humidity, and warm temperatures can contribute to extreme fire behavior."

44.    With the known danger resulting from downed power lines in high winds and in dry conditions, and given the fact HECO Defendants had not received funding to harden their infrastructure (however untimely the request may have been), HECO Defendants had another opportunity to mitigate the risk of deadly wildfires as Hurricane Dora passed the island: de-energizing their power lines. The history of electric fires in Hawai'i, California and other states put HECO Defendants on notice of the need to develop responsible power safety shutdown policies. Indeed, in 2019, HECO Defendants issued a press release ("2019 Press Release"). In the 2019 Press Release, HECO Defendants expressed their commitment to conduct drone surveys across their five-island territory to identify areas vulnerable to wildfires and to determine the best course of action to protect the public and electrical infrastructure. Further, the 2019 Press Release

stated that the drone inspections formed part of HECO Defendants' "proactive assessment and management of vegetation near their electrical infrastructure, especially in drought-prone or dry bush areas." The 2019 Press Release also stated that HECO Defendants evaluated and studied the Wildfire Mitigation Plans that the major California utilities had filed with the California Public Utilities Commission. These Wildfire Mitigation Plans included a PSPS program for shutting off the power to their power lines during High Wind and Red Flag conditions to prevent wildfires.

45.    HECO Defendants never created a PSPS plan. According to The Washington Post, Defendants were "aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to [HEI] and two former power and energy officials" the paper interviewed. HECO Defendants knew shutting off power is "a successful way to prevent wildfires when additional robust techniques are not in place."

46.    HECO Defendants should have long ago developed a more effective de-energization policy widely adopted in other states. Even in the absence of a more comprehensive de-energization policy, the specific warnings preceding the fire or fires that destroyed most of Lahaina on August 8, 2018 (hereinafter "the Lahaina Fire") required HECO Defendants to quickly mobilize to implement an effective strategy to power down its lines, a measure which is easily attainable at a substation or circuit level. Despite HECO Defendants' knowledge about these Red Flag and other warnings, HECO Defendants left their power lines energized. These power lines foreseeably ignited the fastmoving, deadly, and destructive Lahaina Fire.

47.    HECO Defendants admit the first ignition of the Lahaina Fire on the morning of August 8, 2023 was caused when a live electrical wire operated by HECO Defendants fell and ignited nearby vegetation. While HECO Defendants have asserted they shut off the power after the first ignition of the Lahaina fire, it was too late. On information and belief, there was no second ignition point. The first ignition of the Lahaina fire was the only ignition point. The first ignition

17

point was "contained," which meant only that the fire had been surrounded and not extinguished. However, in fact, it was not fully contained, a failure which was foreseeable to HECO Defendants. The fire smoldered and reignited and rapidly spread towards the town of Lahaina. In the alternative, HECO Defendants are wrong, and the power was re-energized and resulted in a potential second ignition point.

48.     In addition, the failure to comprehensively de-energize lines in the path of the Lahaina Fire and/or to timely and accurately inform public safety authorities of the status of lines put more lives at risk as it made it more difficult for residents to safely escape the relentless path of the Lahaina Fire. The Mayor of Maui noted that downed power poles added to the chaos surrounding the Lahaina Fire, as downed power poles, with wires that were live or believed to be live still attached, cut off two important roads, leaving only the narrow highway passable for fleeing cars.

### *Uncontained Vegetation and Poor Emergency Preparedness Exacerbate Lahaina Fire*

49.     MAUI COUNTY officials were ill prepared for the Lahaina Fire. Despite previous fires in 2018 and 2019, and recognition that wildfires crossing Lahainaluna Road would likely devastate Lahaina, they advised residents west of Lahainaluna Road to shelter in place as late as 4:45 pm, well after the fire had gotten out of control and was clearly heading toward Lahaina. Indeed, the fire ignition point was right on the edge of Lahainaluna Road. Nor did MAUI COUNTY officials sound sirens in the area to warn residents that the fire was marching towards them. MAUI COUNTY officials claim that the sirens would have been confused for tsunami warnings and that residents would have headed towards the mountain and thus the fire. Of course, such logic cannot stand since residents exiting their homes and looking towards the mountains would have been overwhelmed with the sight of the approaching fire and smoke. They would have had more time to flee. More time would have saved the life of Doug Gloege who tragically did not

18

get out in enough time. MAUI COUNTY officials claim they used cell phone alerts but, of course, many towers were down. MAUI COUNTY officials were simply unprepared for the fire despite ample time and warning to prepare a proper emergency preparedness program that would use existing sirens or other effective strategies to advise residents earlier to evacuate. Nor did MAUI COUNTY have an effective evacuation strategy that would account for the foreseeable limited exit routes being blocked by debris or downed power poles and lines.

50.     Large landowners, including BISHOP, STATE and MAUI COUNTY, were on notice from a 2018-2019 report from Hawaiʻi Wildfire Management Organization that it was their duty to reduce fire risk to Lahaina and other vulnerable places on Maui with proper vegetation management of flammable fuel loads on their land. They knew there were several means by which to control the non-native wild grass on their land. They knew that managing the vegetation on their land was critical to make sure their property did not contribute to wildfire expansion. They knew failure to manage vegetation on their land would expose Lahaina and its citizens to increased wildfire risk. They knew they could play a role in reducing that risk and that Lahaina was at particularly high risk for wildfires. And yet, on information and belief, they undertook no or poor vegetation management.

51.     HECO Defendants owed a duty to design, construct, inspect, repair, and maintain their power poles, power lines, transformers, reclosers, and other electrical equipment adequately. Defendants also owed a duty to maintain and operate their power lines, overhead electrical infrastructure, and equipment properly to ensure they would not cause a fire. These duties included de-energizing their power lines during Red Flag Warnings to prevent fires and conducting adequate vegetation management, such as clearing vegetation, trees, and tree limbs that could come into contact with their power lines and equipment. In addition, Defendants knew that their

electrical infrastructure was inadequate, aging, and/or vulnerable to failure under the foreseeable and known weather conditions. HECO Defendants failed to fulfill each of these duties.

52.    As an electric utility, HECO Defendants were engaged in a dangerous activity and, accordingly, owed the public a heightened duty of care to avoid foreseeable risks attendant to this activity, including the risk of fire. This heightened duty included exercising a very high degree of care and prudence, such as ensuring the safe transmission of electricity over their infrastructure during high-wind events and monitoring weather conditions that would affect their electrical infrastructure (i.e., forecasted high winds and Red Flag Warnings). HECO Defendants also owed the public a duty to mitigate damage to their electrical infrastructure from high winds, specifically, to prevent a wildfire. Defendants further owed a duty to design and construct their power poles and power lines to perform safely and not fail during foreseeable wind events that would endanger the life of Doug Gloege.

53.    MAUI COUNTY owed a duty to the residents of Lahaina, and Doug Gloege, to develop appropriate emergency preparedness procedures, including effective evacuation strategies to timely alert residents of the need to evacuate and provide appropriate exit routes. MAUI COUNTY was on notice of the potential for catastrophic wildfires in high wind conditions that would spread and devour Lahaina. They did not use effective notice strategies for evacuation. They delayed evacuation orders for certain parts of Lahaina at great risk. They did not arrange for multiple escape routes for quick evacuation. As a result, Doug Gloege was caught in a firestorm trying to escape.

54.    As large landowners, BISHOP, MAUI COUNTY, and STATE, owed a duty to maintain their property to prevent spread of fire to adjacent properties. They had participated in a study on how critical it was to maintain vegetation on their land to avoid the rapid spread of dangerous wildfire in high wind conditions. And yet they did not do the minimal vegetation

management that could have abated the Lahaina Fire. Had they done so, the Lahaina Fire would have slowed and been contained and Doug Gloege would not have been forced to flee with mere moments to escape.

### *Tragic Death of Doug Gloege*

55.    Doug Gloege was born in San Diego, California, but eventually moved to Lahaina, Hawai'i due to his love of the area and to move closer to his mom, dad, and half-brother all living in the area as well. Doug Gloege was drawn to the sun, the beach, and nature of the beautiful island of Maui. He was smart, funny, athletic, good at fixing things, and loved spending time outdoors. Prior to his death on August 8, 2023, Doug Gloege had been a resident of Lahaina for the past 20 years.

56.    Doug Gloege fueled his passion and skill at repairing things into his career in construction. He worked for a number of construction companies throughout his life, but he never changed his career path. He was good at his job and loved to work with his hands in the open air outside the confines of an office or cubicle.

57.    While not working, Doug Gloege also spent considerable time with his girlfriend of 12 years, Rebecca Rans. They had a mutual love of spending time in the sun, beach, and mountains of Maui. They continued to stay together until both of them met their untimely demise by burning to death a few blocks from their home because of the Lahaina Fire.

58.    On August 8, 2023, the fires burning through Maui and the city of Lahaina became national news. PLAINTIFFS became extremely worried about their father's safety, so they did everything they could to obtain information about the fire itself and the whereabouts of Doug Gloege. PLAINTIFFS worked together by using Facebook, google docs, and any other means at their disposal to confirm their father's safety. PLAINTIFFS also began communicating with

Rebecca Ran's sister, Kathleen Hennricks, in order to obtain updates concerning the safety of Doug Gloege.

59.    PLAINTIFFS efforts finally came to a close when the FBI knocked on Plaintiff Jon Gloege's door on August 19, 2023. FBI agents confirmed the news that PLAINTIFFS had been dreading since the beginning of this ordeal: that Doug Gloege was deceased as a result of the Lahaina Fire. FBI agents confirmed that he had been positively identified through fingerprint evidence only a few blocks from his home. The FBI recommended that PLAINTIFFS not view his remains because of how badly Doug Gloege had been burned. Shortly afterwards, Plaintiff Jon Gloege notified Plaintiff Andrea Wheeler.

## **WRONGFUL DEATH**

60.    As a direct and proximate result of Defendants' wrongful conduct causing the death of Doug Gloege, his daughter, Plaintiff Andrea Wheeler, and his son, Plaintiff Jon Gloege, suffered the loss of consortium, including the loss of love, service, society, comfort, affection, moral support, companionship, parental care, protection, attention, and support of their biological father Doug Gloege. This claim is based upon the theories of law and counts alleged below.

## **COUNT I—NEGLIGENCE**

## **(PLAINTIFFS Against HECO DEFENDANTS)**

61.    PLAINTIFFS restate and incorporates the allegations above as if fully stated herein.

62.    HECO Defendants owed the public and Doug Gloege and his survivors the duty to exercise reasonable care in the provision of electrical power, including the duties to:

a.    To design, construct, inspect, repair, and maintain their power poles, power lines, transformers, reclosers, and other electrical equipment adequately;

b.    To maintain, operate, and inspect their power lines, overhead electrical infrastructure, and equipment properly to ensure they would not cause a fire;

c.    To de-energize their power lines during a Red Flag Warning to prevent fires;

d.    To de-energize their power lines during a High Wind Watch to prevent fires;

e.    To de-energize their power lines during high fire danger warnings;

f.    To conduct adequate vegetation management, such as clearing vegetation, trees, and tree limbs that could come into contact with their power lines and equipment;

g.    To de-energize their power lines after Defendants had knowledge that some power lines had fallen or otherwise come into contact with vegetation, structures, and objects;

h.    To de-energize their power lines after Defendants' overhead electrical infrastructure had ignited fires;

i.    To implement reasonable policies and procedures to operate their equipment in such a  manner as to avoid igniting or spreading fire;

j.    To adjust their operations despite warnings about fire weather conditions that could result in downed power lines and cause rapid and dangerous fire growth and spread on and after August 8, 2023; and

k.    To prevent the downing of power lines, which blocked evacuation routes during the Lahaina Fire.

63.    As set forth in the foregoing paragraphs, HECO Defendants breached each and all of these duties owed to Doug Gloege and his survivors by, including but not limited to, failing to properly maintain and keep its electrical poles and power lines in sound condition to encounter foreseeable high wind events (or to underground powerlines) and in failing to de-energize the power in the setting of High Wind and Red Flag conditions.

64.    HECO Defendants knew or should have known that residents of Lahaina, like Doug Gloege, would foreseeably suffer injury or death as a result of HECO Defendants' failure to exercise reasonable and ordinary care.

23

65.     As a direct and proximate result of HECO Defendants' carelessness and negligence, Doug Gloege suffered death. He endured substantial conscious pain and suffering, both physical and emotional in nature. He incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and was otherwise physically, emotionally, and economically injured. He suffered severe pecuniary loss. Doug Gloege's survivors also suffered tremendous anguish and emotional pain and suffering, as well as loss of relationship consortium, resulting from the death of Doug Gloege. The injuries and damages alleged herein are permanent and will continue into the future.

## COUNT II—NEGLIGENCE

### (PLAINTIFFS Against MAUI COUNTY)

66.     PLAINTIFFS restate and incorporates the allegations above as if fully stated herein.

67.     MAUI COUNTY owed the public and Doug Gloege and his survivors the duty to exercise reasonable care in the preparing for and responding to emergencies, including the duties to:

a.      Provide adequate notice or warning to the public of the fire risk and fast-approaching Lahaina Fire; and

b.      Provide adequate escape routes from the fire.

68.     As set forth in the foregoing paragraphs, MAUI COUNTY breached each and all of these duties owed to Doug Gloege and his survivors by, including but not limited to, failing to have proper emergency preparedness procedures.

69.     MAUI COUNTY knew or should have known that residents of Lahaina, like Doug Gloege, would foreseeably suffer injury as a result of the MAUI COUNTY's failure to exercise reasonable and ordinary care.

70.     As a direct and proximate result of the MAUI COUNTY's carelessness and negligence, Doug Gloege suffered death. He endured substantial conscious pain and suffering, both physical and emotional in nature. He incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and was otherwise physically, emotionally, and economically injured. He suffered severe pecuniary loss. Doug Gloege's survivors also suffered tremendous anguish and emotional pain and suffering, as well as loss of relationship consortium, resulting from the death of Doug Gloege. The injuries and damages alleged herein are permanent and will continue into the future.

## COUNT III—LANDOWNER NEGLIGENCE

## (PLAINTIFFS Against COUNTY, BISHOP and STATE)

71.     PLAINTIFFS restate and incorporates the allegations above as if fully stated herein.

72.     MAUI COUNTY, BISHOP, and the STATE (collectively "Landowner Defendants") owed the public and PLAINTIFFS the duty to exercise reasonable care in the maintenance of vegetation on their property, including the duties to:

a.     Use reasonable care to maintain their property in such a way that would avoid causing injury to members of the public;

b.     Prevent and/or remove conditions on its property that are unreasonably dangerous to neighbors and the public;

c.     Take reasonable steps to abate dangers to the public which exist on their property and under their control; and

d.     Adequately manage grasslands and other flammable vegetation on their land to avoid the ignition or spread of wildfire on their land thereby endangering nearby properties.

73.     As set forth in the foregoing paragraphs, Landowner Defendants breached each and all of these duties owed to Doug Gloege and his survivors by, including but not limited to, failing

to properly maintain flammable vegetation on its land thereby endangering nearby properties from the aggressive spread of wildfire.

74.    Landowner Defendants knew or should have known that residents of Lahaina, like Doug Gloege, would foreseeably suffer injury as a result of Landowner Defendants' failure to exercise reasonable and ordinary care.

75.    As a direct and proximate result of Landowner Defendants' carelessness and negligence, Doug Gloege suffered death. He endured substantial conscious pain and suffering, both physical and emotional in nature. He incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and was otherwise physically, emotionally, and economically injured. He suffered severe pecuniary loss. Doug Gloege's survivors also suffered tremendous anguish and emotional pain and suffering, as well as loss of relationship consortium, resulting from the death of Doug Gloege. The injuries and damages alleged herein are permanent and will continue into the future.

## COUNT IV—PRIVATE & PUBLIC NUISANCE

### (PLAINTIFFS Against All Defendants)

76.    PLAINTIFFS restate and incorporates the allegations above as if fully stated herein.

77.    Decedent Doug Gloege had a possessory interest in his residence at 390 Paeohi St., Lahaina, HI 96761 (hereinafter "private rights").

78.    In addition, as a member of the general public, Doug Gloege was entitled to use the streets, roadway, parks and other public spaces in Lahaina, including those that could or would provide him egress from his residence and from Lahaina to reach safety in time of emergency (hereinafter "public rights").

79.    By knowingly and recklessly allowing unmaintained and dangerous vegetation to fuel a foreseeable fire event, and by willfully failing and refusing to take reasonable measures to

resolve said dangerous conditions, Landowner Defendants substantially and unreasonably interfered with Doug Gloege's use and enjoyment of his property and his private rights, thus creating a private nuisance.

80.    By knowingly and recklessly taking no measures to harden its grid, increase power line safety, or de-energize its lines ahead of a foreseeable fire event, and by willfully failing and refusing to take reasonable measures to resolve said conditions, the HECO Defendants substantially and unreasonably interfered with Doug Gloege's use and enjoyment of his property and his private rights, thus creating a private nuisance.

81.    The above-described conduct of all Defendants also caused a substantial and unreasonable interference with the public's right to travel and move freely because it caused roads to become impassable due to fire, debris and/or downed electrical poles and lines, thus constituting a public nuisance.

82.    The injuries to and death of Doug Gloege were unique harms not caused to the general public, and were proximately caused by the aforesaid private and public nuisances. Accordingly, HECO Defendants and Landowner Defendants are all liable to PLAINTIFFS for the tort of nuisance.

**COUNT V—INVERSE CONDEMNATION**

**(PLAINTIFFS Against COUNTY and STATE )**

83.    PLAINTIFFS restate and incorporates the allegations above as if fully stated herein.

84.    The above-described damage to Doug Gloege's personal and real property interests was legally and substantially caused by the actions of Defendants MAUI COUNTY and STATE, and/or each of them, in their use, control, management, and/or maintenance of their property, and in their failure to implement risk mitigation activities and emergency management procedures.

85.    PLAINTIFFS have not received adequate compensation for the damage to and/or destruction of the property, thus constituting a public taking or damaging of by Defendants, and/or each of them, without just compensation.

86.    The actions and/or omissions of the Defendants were a direct and substantial factor in causing the damages to real and/or personal property, including loss of use, interference with access, and/or diminution in value and/or marketability in an amount according to proof at trial.

87.    As a direct and legal result of the actions and/or omissions of the Defendants, PLAINTIFFS have incurred and will continue to incur costs, disbursements, and/or expenses, including reasonable appraisal, engineering, attorney, and/or other expert fees due to the conduct of the Defendants in amounts that cannot yet be ascertained.

## COUNT VI – STRICT LIABILITY FOR HARMS RESULTING FROM INHERENTLY DANGEROUS ACTIVITY

### (PLAINTIFFS Against All Defendants)

88.    PLAINTIFFS restate and incorporates the allegations above as if fully stated herein.

89.    At the time the fire or fires ignited, HECO Defendants were engaged in an inherently dangerous activity delivering electrical energy through grasslands adjacent to residential areas in the presence of high winds.

90.    At the time the fire or fires ignited, and as they continued to spread, Defendants MAUI COUNTY, BISHOP, and STATE were engaged in an inherently dangerous activity of maintaining large amounts of dry flammable grass on their property that exceeded the capacity of any firebreaks or other defensive measures that may have been present.

91.    Defendants' inherently dangerous activity caused the fire or fires to ignite and/or to spread without being contained or suppressed.

92.    At the time the fire or fires ignited and then spread, Defendants' above-described activities were ones that carried peculiar risk to human safety, and/or that involved special danger.

93.    The aforesaid activities caused the fires to ignite and spread.

94.    In carrying on the aforesaid inherently dangerous activity, Defendants are strictly liable to PLAINTIFFS for the harms they and Doug Gloege's other survivors suffered and continue to suffer as a result of the fire.

95.    In carrying on the aforesaid peculiarly risky activity, Defendants are strictly liability to PLAINTIFFS for the harms they and Doug Gloege's other survivors suffered and continue to suffer as a result of the fire.

96.    These aforesaid inherently dangerous activities and/or peculiarly risky activities for which Defendants are strictly liable caused harm and injury to PLAINTIFFS, and Defendants are jointly and severally liable to the extent permitted by law to PLAINTIFFS for compensatory damages for said harms and injuries and, are further liable to PLAINTIFFS for punitive damages to the extent permitted by law.

## **PUNITIVE DAMAGES**

### **(PLAINTIFFS Against All Defendants)**

97.    PLAINTIFFS restate and incorporates the allegations above as if fully stated herein.

98.    At all times material hereto, Defendants knew that the risk of wildfires caused by electrical wires downed during high wind events and spread through properties inundated with dangerous grassland could result in the development of serious harm and death.

99.    At all times material hereto, Defendants engaged in conduct that constitutes malice and oppression. Despite repeated warnings and considerable studies on the subject, Defendants continued to operate the electrical grid and properties, respectively, knowing that wildfires were a likely consequence of the dry and windy conditions on Maui without taking the necessary

precautions in order to save money. They knew that although they were saving money, they were putting lives at risk. Defendants acted with malice. Such conduct was despicable and oppressive.

100.    As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of the residents of Lahaina, Doug Gloege suffered incalculable suffering and death. PLAINTIFFS in turn suffered unimaginable suffering at the loss of their father.

101.    The aforesaid conduct was committed with knowing, conscious, and deliberate disregard for the rights and safety of residents of Lahaina, including Doug Gloege herein, thereby entitling PLAINTIFFS to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

102.    In performing or neglecting to perform all of the acts and omissions described herein, Defendants acted wantonly, oppressively, recklessly, or with gross negligence.

103.    As a result of the aforementioned wanton, reckless, unlawful, grossly negligent, and/or illegal acts and/or omissions of Defendants should be held liable for punitive damages in an amount sufficient to punish and deter Defendants in light of the severity of their conduct and their financial condition.

## **INJUNCTIVE RELIEF**

### **(PLAINTIFFS Against All DEFENDANTS)**

104.    PLAINTIFFS restate and incorporates the allegations above as if fully stated herein.

105.    The conduct of Defendants described herein has only been temporarily abated by the fires themselves, which have caused interruptions in utility service and have burned up much of the grass fuel on Landowner Defendants' lands.  However, said grass is well adapted to surviving fires and regrowing after a fire, and is likely to do so in the next rainy season that will start in Fall 2023.  Landowner Defendants also own other lands near and adjacent to Lahaina that

have not yet been consumed by fire and remain a clear and permanent threat to the physical safety of the public in Lahaina. Moreover, the electrical grid owned and operated by HECO Defendants continues to decay and present a risk any time high wind and other Red Flag conditions present themselves on Maui. Thus, there is a real and significant danger that, unless the nuisances described herein are not abated, further death, injury and destruction will occur.

106.    PLAINTIFFS intend to visit Lahaina and other parts of Maui in the next several months to honor and commemorate their father Doug Gloege and put his soul to rest. Therefore, they expect to be present in Lahaina and other parts of Maui and be exposed to continued threat of wildfires.

107.    By virtue of the foregoing, PLAINTIFFS are entitled to an injunction against all Defendants, enjoining Defendants from engaging in the activities described herein which have and will likely in the future cause harm to the public.

## JURY DEMAND

108.    PLAINTIFFS demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS pray for judgment as follows:

a.    As to all Counts and all DEFENDANTS, damages to the PLAINTIFFS according to proof including as applicable:

i.    Past and future medical and care expenses of PLAINTIFFS according to proof;

ii.    Cost of burial and other funeral expenses;

iii.    Other economic loss;

b.    As to all Counts and all DEFENDANTS, Non-economic damages according to proof including as applicable:

        i.       Compensation for physical pain and discomfort;

        ii.      Compensation for fright, nervousness, anxiety, worry, and apprehension;

        iii.     Loss of society, companionship, comfort, consortium, or protection;

        iv.     Loss of filial care, love and affection;

c.      As to all Defendants, a permanent injunction enjoining them from engaging in the dangerous activities and nuisance described above.

d.      As to all Counts and all DEFENDANTS, punitive damages to the extent permitted by law against each such DEFENDANT in such amounts as the court or jury may award.

e.      As to all Counts and all DEFENDANTS, awarding pre-judgment and post-judgment interest to the PLAINTIFFS according to proof;

f.      As to all Counts and all DEFENDANTS, awarding reasonable costs to the PLAINTIFFS as provided by law; and

g.      As to all Counts and all DEFENDANTS, granting all such other relief as the Court deems necessary, just and proper.

DATED: Honolulu, Hawai‘i, September 18, 2023.


*/s/ James J. Bickerton*
JAMES J. BICKERTON
BRIDGET G. MORGAN-BICKERTON
TYLER D. MINCAVAGE

Attorneys for PLAINTIFFS
JON GLOEGE and ANDREA WHEELER

## IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

## STATE OF HAWAIʻI

| | |
|---|---|
| JON GLOEGE, individually, ANDREA WHEELER, individually and on behalf of the heirs of DOUG GLOEGE, | CIVIL NO: (Other Non-Vehicle Tort) |
| *Plaintiffs*, | **DEMAND FOR JURY TRIAL** |
| v. | |
| MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAIIAN ELECTRIC INDUSTRIES, INC.; ELLIOT KAWAIHOʻOLANA MILLS, CRYSTAL KAUILANI ROSE, JENNIFER NOELANI GOODYEAR-KAʻŌPUA, MICHELLE KAʻUHANE, AND ROBERT K.W.H. NOBRIGA, TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP; COUNTY OF MAUI; STATE OF HAWAIʻI; DOES 1-100; | |
| *Defendants*. | |

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable in the above-entitled cause. This Demand for Jury Trial is made pursuant to Rule 38 of the Hawaiʻi Rules of Civil Procedure.

DATED: Honolulu, Hawaiʻi, September 18, 2023.

/s/ James J. Bickerton
JAMES J. BICKERTON
BRIDGET G. MORGAN-BICKERTON
TYLER D. MINCAVAGE

Attorneys for PLAINTIFFS
JON GLOEGE and ANDREA WHEELER

| STATE OF HAWAIʻI<br>CIRCUIT COURT OF THE<br>SECOND CIRCUIT | SUMMONS<br>TO ANSWER CIVIL COMPLAINT |
|---|---|

| CASE NUMBER | PLAINTIFF'S NAME & ADDRESS, TEL. NO. |
|---|---|
| **PLAINTIFF**<br>JON GLOEGE, individually, ANDREA WHEELER, individually and on behalf of the heirs of DOUG GLOEGE, | JON GLOEGE, individually, ANDREA WHEELER, individually and on behalf the heirs of DOUG GLOEGE<br>c/o James J. Bickerton, Esq.<br>Bridget G. Morgan-Bickerton, Esq.<br>Tyler D. Mincavage, Esq.<br>745 Fort Street, Suite 801<br>Honolulu, HI 96813 (808) 599-3811 |

| DEFENDANT(S)<br>MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAIIAN ELECTRIC INDUSTRIES, INC.; ELLIOT KAWAIHOʻOLANA MILLS, CRYSTAL KAUILANI ROSE, JENNIFER NOELANI GOODYEAR-KAʻŌPUA, MICHELLE KAʻUHANE, AND ROBERT K.W.H. NOBRIGA, TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP; COUNTY OF MAUI; STATE OF HAWAIʻI; DOES 1-100; | |
|---|---|

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to filed with the court and serve upon

James J. Bickerton, Esq./Bridget G. Morgan-Bickerton, Esq./Tyler D. Mincavage, Esq.
Bickerton Law Group, LLLP
745 Fort Street, Suite 801
Honolulu, HI 96813

_____,
plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRYOF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

DATE ISSUED  September 18, 2023
_____

Effective Date of 03-Jul-2023
signed by: /s/M. Ferreira
Clerk, 2nd Circuit, State of Hawaiʻi

The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http://www.courts.state.hi.us





If you need an accommodation for a disability when participating in a court program, service, or activity, please contact the ADA Coordinator as soon as possible to allow the court time to provide an accommodation:
Call (808) 244-2855 FAX (808) 244-2932 OR Send an e-mail to: adarequest@courts.hawaii.gov. The court will try to provide, but cannot guarantee, your requested auxiliary aid, service or accommodation.

*(Rev. 7/3/2023)*